IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

APRIL R. R.,[1]  )
 )
       Plaintiff, )
 )
vs. ) Case No. 19-cv-00542-DGW[2]
 )
COMMISSIONER of SOCIAL )
SECURITY, )
 )
       Defendant. )

**MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for disability benefits in August 2015, alleging disability as of December 17, 2013. After holding an evidentiary hearing, an ALJ denied the application on February 28, 2018. (Tr. 12, 20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in

---

[1] In keeping with the court's practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 6.

this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred by failing to fully and fairly develop the record.
2. The ALJ erred in the course of evaluating plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms.
3. The ALJ erred by impermissibly playing doctor by interpreting medical evidence in the course of formulating his RFC determination.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? And (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three,

precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date through her date last insured of September 30, 2017.

The ALJ found that plaintiff had severe impairments of degenerative disc disease with lumbar spine disc bulges and obesity.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform sedentary work except she can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolding. She can occasionally balance, stoop, kneel, crouch, and crawl.

Through the date last insured, the claimant was capable of performing past relevant work as a ticket seller.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to plaintiff's arguments.

**1. Agency Forms**

Plaintiff was born in 1969 and was 48 years old on the date of the ALJ's decision. (Tr. 126). Plaintiff said she stopped working on December 17, 2013, because of her conditions. She worked as a cashier at a truck stop, a cashier at a theater box office, and a store cashier. (Tr. 139-140).

In a Function Report submitted in October 2015, plaintiff said she cannot stand, walk, or sit for very long periods at a time due to her back pain. She will go from her recliner to a chair to her bed several times a day for relief. Her back pain makes it hard for her to sleep and to perform basic personal care. She used to cook meals that took longer, but she does not anymore due to her back pain. She always needs to lean on a shopping cart at the grocery store. She said she used to visit family and friends often and go out to eat, but now she stays home because of her back. She said her conditions affect her lifting, squatting, bending, standing, reaching, walking, sitting, and stair climbing. She uses a cane sometimes. (Tr. 153-159).

**2. Evidentiary Hearing**

Plaintiff was not represented by an attorney at the evidentiary hearing in October 2017. The ALJ acknowledged this, reminded plaintiff of her right to representation, clarified whether plaintiff wanted to continue without counsel, and then asked if there was anything not currently in her file that she may want in there. Plaintiff said, "No, I think everything's in there." At the end of plaintiff's testimony, the ALJ asked if there was anything they had not talked about that plaintiff thought the ALJ needed to know before deciding the case, and plaintiff answered, "I don't think so." (Tr. 27-29, 37).

Plaintiff said she has used a cane and a walker since she injured her back. She said she herniated a disc around November 2013 and said she could not go

back to work after she hurt her back. She said she cannot lift, walk very far, or do hardly anything, and her back problem has gotten worse over the past one to two years. She said she tried physical therapy, but it did not seem effective. She said a back doctor suggested she undergo back surgery. However, her primary care physician said she was unsure if plaintiff would heal well due to her weight and diabetes. (Tr. 31, 33-36).

A vocational expert (VE) testified that a person with plaintiff's RFC could do her past work as a ticket seller, but if said individual were off task 15% of the time, that would eliminate all competitive work. (Tr. 39-40).

### 3. Relevant Medical Records

On December 18, 2013, plaintiff underwent an MRI of her spine, and the impression was:

> 1. Large central disc herniation at L3-4 interspace with disc extrusion[3] around the midline impinging the dural sac[4] and narrowing the central canal associated with mild to moderate narrowing of neural foramina[5].
> 2. Large disc herniation at L4-5 again associated with central stenosis[6] and disc extrusion with significant mass effect on the dural sac and the central nerve roots. The same level shows some narrowing of the neural foramina bilaterally more on the left.
> 3. There is also a large disc herniation with disc extrustion at L5-S1

---

[3] Disc extrusion refers to, "a type of intervertebral disc herniation in which the soft material of the disc, the annulus pulposus, bulges from the disc after breaking through the fibrous outer part of the disc." https://www.thespinepro.com/conditions/disc-extrusion/, visited on February 2, 2020.
[4] Dural sac refers to, "The membranous sac that encases the spinal cord within the bony structure of the vertebral column." https://www.medicinenet.com/script/main/art.asp?articlekey=40199, visited on February 2, 2020.
[5] Neural foramina refers to, "the small openings between the bones in your spine." https://www.healthline.com/health/neural-foraminal-stenosis, visited on February 2, 2020.
[6] Central stenosis refers to, "narrowing of the spaces within your spine, which can put pressure on the nerves that travel through the spine." https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961, visited on February 2, 2020.

> as described above significantly impinging the dural sac and narrowing the central canal along with stenosis of the neural formen.

(Tr. 280-281).

Plaintiff saw Dr. Ghalambor, a pain management specialist, on January 15, 2014, after a referral by Kim Burgess, a nurse practitioner. Plaintiff presented with low back and leg pain, and said her symptoms became much worse about four weeks prior without any known trigger event. Plaintiff said her pain was as low as a one out of ten and as high as a ten out of ten in the past twenty-four hours. She was completely off work the last couple weeks and her pain got better. She described the pain as cramping and throbbing, and interfering with normal work, walking ability, and sleep. She said her pain is worse when standing, lying down, sneezing, and coughing, but it is better with sitting. Plaintiff said she tried ice and heat which was unhelpful and had not tried physical therapy yet but took over-the-counter medications. (Tr. 316).

Upon physical examination, Dr. Ghalambor noted plaintiff's flexion, extension, rotation and lateral bending of the lumbar spine was full and did not reproduce lumbar pain. Also, a Patrick's test and straight leg raise test both came back negative bilaterally. Dr. Ghalambor's assessment was, "Severe degenerative disk disease with severe disk herniations/extrusions at L3-4, L4-5 and L5-S1 resulting in severe central canal stenosis at all these 3 levels." Dr. Ghalambor said, "Surprisingly patient is still neurologically intact and the pain is actually less than what one would expect from these rather severe anatomical findings." Dr.

Ghalambor did an urgent referral to a spine surgeon and had plaintiff stay off work for another month. (Tr. 316-317).

On November 14, 2014, plaintiff presented to Cory Hanley, M.S.P.T. (Master of Science in Physical Therapy) regarding her lumbar issues. Plaintiff said the date of onset was about a year prior and said she had no treatment since the year before due to having no insurance until recently. MSPT Hanley noted a previous MRI that revealed, "Large disc herniation at L3-4, L4-5, and L5-S1 with narrowing of the neural foramina and central canal noted at all 3 levels." She said she saw a pain specialist, Dr. Ghalambor, in January, said he did not believe injections would help, and said he wanted to refer plaintiff to a surgeon. Plaintiff said she never visited a surgeon due to lack of insurance. MSPT Hanley noted plaintiff was moderately restricted in her ROM regarding extension, flexion, and left side bending. (Tr. 217-218).

In his diagnosis, MSPT Hanley said plaintiff had surprisingly good strength, range of motion (ROM), and pain and functions considering the MRI report a year prior. MSPT Hanley's findings revealed impaired ROM, flexibility, and joint mobility, and pain and impaired positional tolerance. MSPT Hanley suggested plaintiff return twice a week for five weeks and gave her home exercises. (Tr. 220).

Plaintiff saw MSPT Hanley three times in November 2014. Plaintiff reported pain at a two to three out of ten, reported stiffness, did not appear to have pain increase during the treatment, denied increased pain or soreness, tolerated the exercises well, and responded well to the treatment. (Tr. 221-225).

On November 21, 2014, plaintiff presented to St. Anthony's Memorial Hospital complaining of low back pain. She reported an acute worsening of her back pain since December 2013. The doctor noted an MRI showed, "3-level disc herniations with resultant severe spinal stenosis." He also noted she was referred to a spine surgeon, but, per plaintiff, they refused to see her because she was without insurance. The doctor reviewed the December 2013 MRI saying it showed "very concerning pathologies" consisting of "large disk herniations at L3-4, L4-5, and L5-S1 resulting in significant central canal stenosis with impingement of the dural sac at L3-4" and multilevel foraminal narrowing. Plaintiff reported four out of ten pain and had a negative straight leg raise bilaterally. The doctor's assessment included low back pain, lumbar spinal stenosis, lumbar degenerative disc disease[7], and lumbar spondylosis[8]. (Tr. 263-265).

Plaintiff saw MSPT Hanley for four appointments between December 2, 2014 and December 11, 2014. Plaintiff denied back pain, said her doctor expects her to have surgery after seeing her MRI results, she tolerated the progression of treatment well, expressed confidence that her back tightness decreased, and appeared to have limited mobility, but never complained of pain during treatment. (Tr. 227, 229, 231, 233).

---

[7] Degenerative disc disease refers to, "when normal changes that take place in the disks of your spine cause pain." https://www.webmd.com/back-pain/degenerative-disk-disease-overview#1, visited on February 2, 2020.
[8] Spondylosis refers to, "some type of degeneration in the spine." https://www.spine-health.com/conditions/lower-back-pain/spondylosis-what-it-actually-means, visited on February 2, 2020.

Plaintiff had her last appointment with MSPT Hanley five days later reporting decreased pain but continued to complain of low back fatigue and tightness. Her current measure of pain was a zero out of ten and a two out of ten at the worst. She reported occasional pain that decreased, and said it was aggravated with standing, stooping, and bending but better with sitting and laying on her side. MSPT Hanley noted plaintiff would benefit from additional skilled physical therapy, but plaintiff said she wanted to conserve the remaining available insurance visits for physical therapy in case symptoms worsen or she has surgery. (Tr. 235-236).

On May 4, 2015, plaintiff presented to James Harms, an orthopedic surgeon, for a consultation regarding her back. Dr. Harms' physical examination revealed no gross deformity of the back, plaintiff could forward bend to get her fingertips halfway from her knees to her ankles, she was moderately limited in backward bending, and her straight leg raising in the sitting position was not particularly uncomfortable. Plaintiff reported the pain as a three on a ten-point scale and said it is severely affecting her life. (Tr. 243-244).

Dr. Harms noted plaintiff underwent an MRI on December 18, 2013, which revealed "degenerative disc disease with disc narrowing and loss of water signal at the last three discs and large disc bulges at the last three levels severely narrowing the spinal canal." Dr. Harms noted plaintiff went through an MRI more recently and said the report "says about exactly the same thing." Based on the information he reviewed, Dr. Harms believed plaintiff had arthritis of the back, which would cause soreness and stiffness after being in one position for a long time. Dr. Harms

said plaintiff has old discs in her back that would cause backache, and she has very large disc bulges at three spots. This, he says, is called spinal stenosis and would cause issues walking. He said plaintiff could get better with time, but it probably would not be soon. He said plaintiff has options such as temporary things like heat, ice, massage, physical therapy, pain pills, muscle relaxants, nerve pills, braces or corsets, and epidural injections, and more permanent things like back surgery. However, Dr. Harms expressed concern about the risk of heart attack, stroke or infection due to her diabetes and current weight. He said, "Most people would not be walking around with a smile on their face like she is. She must be a tough character to put up with this as long as she has." Dr. Harms' impression was, "Premature degenerative disc disease and arthritis complicated by large disc bulges at L3-L4, L4-L5, and L5-S1, taking up a large percentage of the spinal canal in a patient who must be tough [as] nails." (Tr. 244-245).

An MRI of the lumbar spine was noted on November 7, 2014, within the medical records, but no report followed. (Tr. 288).

Plaintiff presented to NP Burgess on November 12, 2014, and reported recurrent back pain that radiates into her left leg with increased activity. Plans included a physical therapy referral and an evaluation for epidural injections. (Tr. 260, 262).

Between May 2015 and June 2017, plaintiff presented multiple times to NP Burgess, Heather Barnes, a nurse practitioner, and Erin Swingler, a nurse practitioner. During this time, they noted nothing regarding back pain either

objectively or subjectively, and plaintiff had a normal gait. (Tr. 247-248, 250-251, 254-257, 303, 308, 313).

Plaintiff presented to NP Burgess on August 10, 2017, to discuss disability paperwork and low back pain. Plaintiff complained of chronic, constant, low back pain that is intermittent and moderate in intensity, dull, and radiates to the left and right buttock. Her symptoms included stiffness and radicular bilateral leg pain. Plaintiff said her pain worsens with back flexion, back extension, and twisting movements, said her pain started in 2013, said it progressed in severity resulting in an emergency room visit in November 2013, and said she was unable to work starting December 16, 2013. Plaintiff reported the pain becoming more stable, experiencing pain every day at a two to three out of ten, and experiencing pain at a seven out of ten with activity. Plaintiff could sit thirty minutes or less continuously, stand less than ten minutes continuously, walk without assistance less than fifteen minutes, walk with assistance for twenty minutes, and was unable to twist, stoop or bend. NP Burgess noted plaintiff had a slow gait, decreased range of motion in her back, and pain with range of motion in her right hip. NP Burgess ordered an MRI of plaintiff's lumbar spine. (Tr. 299, 301).

Plaintiff underwent an MRI of her spine on August 16, 2017, and mention was made of an older study performed in November 2014. The impression consisted of:

> 1[.] Multilevel severe degenerative changes with chronic calcified disc – extrusions including L1-L2, L3-4, L4-5 and L5/S1. 2. At all the levels the appearances are chronic compared to 2014 except more

>   pronounced disc extrusion at the level L1-L2 and L5/S1 as described. 3. L3-4: Due to large disc extrusion there is stenosis of the central canal of at least moderate degree and moderate narrowing of both neural foramen. 4. L4-5: Significant central canal stenosis and stenosis of the lateral recesses[9]. At least moderate stenosis of the neural foramen which is worse on the left. 5. L5/S1: Large disc extrusion more pronounced left due to midline obliterating the central canal and the left lateral recess and associated moderate to severe narrowing of the left neural foramen worse than before.

(Tr. 336).

On August 25, 2017, the Office of Disability Adjudication and Review received a letter from NP Burgess saying, "Due to the severity of the back pain with radicular symptoms into her legs, she has been unable to work since December 2013. She is unable to sit for more than 30 minute intervals and unable to walk for more than 15 minute intervals." Referring to plaintiff's lumbar MRI, NP Burgess said, "These are chronic changes that will not improve. Please consider her for permanent disability in light of the severity of her back disease." (Tr. 290).

## **Analysis**

First, plaintiff argues the ALJ failed to fully and fairly develop the record. To support this assertion, plaintiff points out that she was unrepresented at the evidentiary hearing and there were missing medical records. An ALJ has an independent duty to develop the record fully and fairly. 20 C.F.R. § 404.1512(b). "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against

---

[9] Lateral recess refers to, "the space within the spinal canal that is located toward the sides." https://www.verywellhealth.com/lateral-recess-296475, visited on February 2, 2020.

granting benefits [internal citation omitted]." *Sims v. Apfel*, 120 S. Ct. 2080, 2085 (2000). That duty is enhanced where plaintiff was pro se at the agency level. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). "Where the disability benefits claimant is unassisted by counsel, the ALJ has a duty to 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts…'" *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991).

At the evidentiary hearing, the ALJ acknowledged plaintiff was without counsel, reminded plaintiff of her right to representation, asked whether plaintiff wanted to continue without counsel, and then asked if there was anything not currently in her file that she may want in there. Plaintiff said, "No, I think everything's in there." At the close of plaintiff's testimony, the ALJ asked if there was anything plaintiff thought the ALJ needed to know before deciding the case, and plaintiff answered, "I don't think so." (Tr. 27-29, 37).

Although the ALJ took measures to ensure the evidentiary hearing was fair, the ALJ still had a duty to compile a complete record. What is most concerning is the ALJ's failure to obtain the November 2014 MRI, among other things like referrals for plaintiff's back pain. MRI's can be extremely informative as to a claimant's condition, and they become of greater significance when there are other MRI's in the record because the missing MRI could help fill in a potential gap. That said, because the MRI was missing and because plaintiff was unrepresented at the evidentiary hearing, it cannot be assumed plaintiff presented her best case. See *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). An ALJ satisfies their duty

to develop the record when the ALJ investigates for possible disabilities and discovers all relevant evidence. *Jozefyk v. Berryhill*, 923 F.3d 492, 497 (7th Cir. 2019). To prove the ALJ failed, "the claimant must point to specific, relevant facts that the ALJ did not consider." *Id*.

The unfortunate result was a gap in the record regarding a missing MRI. An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The Court must conclude that the ALJ failed to build the requisite logical bridge here.

Second, plaintiff argues the ALJ erred in the course of evaluating plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms.

SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p became effective on March 28, 2016 and is applicable here. 2017 WL 5180304, at *1. The new SSR eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. *Ibid*. at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding his symptoms. Thus, prior Seventh Circuit

precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Plaintiff's argument that the ALJ's application of whether plaintiff's statements "were entirely consistent with the medical evidence and other evidence" was meaningless boilerplate. This argument is borderline frivolous. The "not entirely consistent" language is, as plaintiff asserts, boilerplate language that appears in many ALJ decisions. However, the use of boilerplate language is harmless where the ALJ goes on to give his reasons for his decision. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). The use of the phrase "not entirely consistent" does not suggest that the ALJ used an incorrect standard. The ALJ cited the correct standard at Tr. 16 and discussed the relevant factors in assessing plaintiff's allegations.

Plaintiff further argues that the ALJ erred by saying plaintiff, "has not received any further specialty treatment" for her back issues except for a visit at the

Carle Spine Institute. It can be argued either way whether physical therapy is considered "specialty treatment," and plaintiff is correct when she says the ALJ neglected the appointment she had with the pain management specialist, Dr. Ghalambor, in January 2014. However, the ALJ simply neglecting to say plaintiff saw a pain management specialist is not enough to require remand.

Additionally, the ALJ failed to recognize that plaintiff never saw the referred spine surgeon because they turned her away due to having no insurance. (Tr. 217, 263). The ALJ should have known from plaintiff's statements in the medical records that she lacked insurance which prevented her from seeking additional medical attention. An ALJ should not rely on "an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014).

The problem also lies in the ALJ's decision where he reduces plaintiff's physical therapy treatment into two short sentences and neglects that plaintiff lacked insurance at times. (Tr. 17). Plaintiff took part in at least nine physical therapy appointments. Medical professionals take note of many things in their appointments, such as subjective complaints, objective assessments and findings, diagnoses, a patient's medical history, and more. With that said, it is impossible for nine physical therapy appointments to be adequately and fairly reflected within two sentences of an ALJ's decision, and this could unfairly affect the judgment of plaintiff's credibility.

The ALJ "need not provide a complete written evaluation of every piece of testimony and evidence." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (citation and internal quotations omitted). However, the Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

Lastly, plaintiff argues the ALJ erred by impermissibly playing doctor by interpreting medical evidence in the course of formulating his RFC determination.

Plaintiff is correct when she says the ALJ took it upon himself to interpret the August 2017 MRI results and then conclude plaintiff could perform sedentary work. In *McHenry v. Berryhill*, the court decided the ALJ erred by interpreting an MRI himself rather than having a doctor explain the significance. 911 F.3d 866, 871 (7th Cir. 2018). Here, the ALJ took the interpreting radiologist's language that certain aspects of plaintiff's spine were worse than before and used that to decide for himself that plaintiff is able to do sedentary work. The ALJ erred by failing to have a medical professional explain the significance of the MRI findings, which then would allow the ALJ to make a more qualified decision as to plaintiff's RFC. Therefore, the Court accepts plaintiff's argument and remand is required.

Regarding NP Burgess, the ALJ correctly established the lack of complaints by plaintiff of her pain when she visited NP Burgess, with one complaint of back

pain to NP Burgess in November 2014. Within a number of other appointments, NP Burgess noted plaintiff as negative for back pain, and those complaints did not come until plaintiff was filing for disability. The ALJ taking this inconsistency into consideration in comparison to the worsening MRI results does not alone require remand. Therefore, this Court rejects this point.

The Court must conclude ALJ failed to build the requisite logical bridge regarding plaintiff's first issue. *Terry*, 580 F.3d at 475. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: February 18, 2020.**

                                      **DONALD G. WILKERSON**
                                      **UNITED STATES MAGISTRATE JUDGE**